## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

```
                                   :
JOHN A. RUSSELL CORPORATION,       :
     Plaintiff,                    :
                                   :
     v.                            :    No. 2:05-cv-321
                                   :
FINE LINE DRYWALL, INC.; and       :
ACSTAR INSURANCE COMPANY,          :
     Defendants.                   :
                                   :
```

## OPINION AND ORDER

Plaintiff John A. Russell Corporation ("Russell") commenced suit in this Court on December 6, 2005, alleging breach of contract by Defendant Fine Line Drywall, Inc. ("Fine Line") and seeking action on the performance and payment bond ("the Bond") issued by Acstar Insurance Company ("Acstar") and an order to compel arbitration.  Acstar raised as an affirmative defense Russell's alleged failure to commence suit timely under the Bond, and on January 19, 2006, moved for a determination of the arbitrability of this defense.  Plaintiff stipulated that Acstar's timeliness defense was not subject to arbitration and should be resolved by the Court.  Both parties subsequently moved for summary judgment on the timeliness defense.  For the reasons set forth below, Plaintiff's Motion for Summary Judgment (Doc. 32) is GRANTED, and Acstar's Cross-Motion for Summary Judgment (Doc. 47) is DENIED.

## I.   FACTS

Intrawest Stratton Development Corporation hired Russell, as a general contractor, to construct 38 condominium units known as the Rising Bear Lodge Condominium at the Stratton Mountain Resort. On October 16, 2003, Russell entered into a contract ("the Subcontract") with Fine Line, who agreed to provide metal framing and gypsum drywall systems for the Rising Bear project. In conformity with its obligations under the Subcontract, Fine Line subsequently secured a performance and payment bond; the Bond was issued by Acstar as Surety with Fine Line as Principal and Russell as Obligee.

The Bond provides for payment of up to $1,186,034 (the full amount payable to Fine Line under the Subcontract) unless "the Principal [Fine Line] shall well and truly perform all the work specified in said contract, and shall promptly make payments to all persons supplying the Principal with labor and materials in the prosecution of the work provided for in said contract." (Doc. 34-1.)

The Bond also contains a time limitation provision: "[N]o suit or action shall be commenced hereunder after the expiration date of one year following the date on which Principal ceases work on said contract or the date on which final payment under the contract falls due, or the date on which goods and services were received by obligee, whichever occurs first." *Id.*

2

Fine Line began work on the project in November of 2003.  In September of 2004, Fine Line, either due to financial difficulties or to a pricing dispute, failed to pay one of its suppliers, Hyster New England, who consequently placed a mechanic's lien on the Rising Bear project.  Russell sent a letter dated September 16, 2004 to Fine Line and ACSTAR requesting that Fine Line clear the lien.  The Hyster lien was thereafter cleared by the Defendants.  (Russell Dep. 19:9-20:8, Apr. 2, 2007.)

On November 10, 2004, Fine Line walked off the job. (Russell Dep. 8:17-8:23.)  On November 18, one of Fine Line's subcontractors filed a lien on Rising Bear Lodge Condominium. That same day, Russell faxed a second letter to Fine Line and Acstar in which it declared Fine Line to be in default (based on its failure to pay its subcontractors in excess of $300,000) and asked Fine Line and Acstar to take immediate action to remedy this breach.  (Doc. 34-6.)  Fine Line did not respond to this letter. (Russell Dep. 20:17-20:23.)

On December 16, Russell entered into a separate subcontract with Builder's Insulation (previously one of Fine Line's subcontractors) to complete work on the Rising Bear project that Fine Line had left unfinished.  (Russell Dep. 9:16-11:5.) Builders Installation then returned to the work site and completed its work on December 16 and 17, 2004.  *Id*.

Acstar made payments to at least two of Fine Line's subcontractors on January 17, 2005, and February 2, 2005. (Doc. 34-10.) Russell filed a claim with Acstar on February 18, 2005. (Doc. 34-12.) However, after conducting an inquiry, Acstar rejected Russell's claim in a letter dated July 12, 2005. *Id*. Acstar's letter cited Russell's alleged overpayment of Fine Line as grounds for its denial of payment. *Id*.

Russell filed its Complaint with the Court on December 6, 2005.

## II. **SUMMARY JUDGMENT STANDARD**

The Court will grant a motion for summary judgment if no genuine issue of material fact exists and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In deciding whether a genuine issue of material fact exists, the Court interprets all ambiguities and draws all inferences in favor of the non-moving party. *Id*. (citing *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003). *See also* Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

4

### III.  <u>DISCUSSION</u>

Acstar has asserted that enforcement of the Bond is barred because Russell commenced suit after the expiration of the period specified on the face of the Bond.  As noted above, the time limitation provision in the Bond provides three potential trigger dates, two of which are relevant in the instant case.  Although the parties advance conflicting interpretations of these clauses and arrive at different trigger dates, Russell has conceded that the time limitation provision, unless void, would preclude action on the Bond.  Consequently, the dispositive issue in this case is whether the time limitation provision in the bond violates 8 V.S.A. § 3663 and is void.  If the time limitation provision is unenforceable, then Acstar's timeliness defense fails, and Russell is entitled to seek remedies under the Bond.

### A.  Application of § 3663

Section 3663 provides in relevant part that a "surety or fidelity contract or bond issued or delivered in this state by an insurance company doing business herein shall not contain a condition or clause limiting the time of commencement of an action on such policy or contract to a period less than twelve months from the occurrence of the loss, death, accident or default. . . .  Any such conditions or clauses shall be null and

5

void."[1]

The time limitation provision in the Bond limits the obligee to commencing an action under the Bond within one year of the earliest of three potential triggering events.  Thus, if any of these events took place before the default, the time limitation provision in the Bond would effectively provide less than twelve months from the date of default for the obligee to commence an action.  As such, the provision would be null and void.  To determine whether the provision violates § 3663, the Court must make two determinations: (1) when the default occurred; and (2) when the time limitation provision in the Bond was triggered.

The latter issue has been hotly contested by the parties, who diverge in their interpretations of every relevant aspect of the time limitation provision in the Bond.  First, Plaintiff argues that the "cease work" clause should be read broadly to include work performed by the Principal's subcontractors (on December 17, 2004), while Defendant Acstar urges a narrower construction.  Additionally, Plaintiff argues that the "goods received" clause refers to the first receipt of goods or services by Russell from Fine Line (occurring in November of 2003), while Defendant Acstar argues that the clause refers to the last such receipt (November 10, 2004).

In contrast, the parties have only partially addressed the

---

[1]  Acstar qualifies as an insurance company under the statutory definition.  Vt. Stat. Ann. tit. 8, § 3301(a)(8) (2001).

antecedent issue of Fine Line's default.[2]  Yet the Court cannot
rationally decide whether the time limitation provision violates
§ 3663 without a definition of what constitutes default under the
statute and an assessment of when the default occurred.  To
decide whether the Bond provision cut short the minimum statutory
period for bringing suit without first determining when the
statutory period began is a task more suited for augury and
divination than reasoned legal analysis.  Consequently, before
addressing the parties' arguments about interpretation of the
Bond, the Court will first consider the logically prior and
largely decisive issue of default.

   **1.  Occurrence of Default**

   The preliminary question is when the "default" contemplated
by § 3663 occurred.  Title 8 does not provide an explicit
definition of default; however, the broad language of the statute
("the occurrence of the loss, death, accident or default")
indicates that the definition must be drawn from the specific
language of the underlying bond or insurance contract itself.

   The Vermont Supreme Court has repeatedly held that insurance

---

[2]  Russell asserts in its L.R. 7.1(c)(1) statement that the
default occurred "sometime around November 18, 2004" (though in
its accompanying brief, Russell states that the default may have
taken place as early as September of 2004). (Doc. 33.)  Acstar,
in its L.R. 7.1(c)(2) statement, properly objects to Russell's
assertion as a legal conclusion rather than a statement of fact,
but concedes in its accompanying Cross-Motion for Summary
Judgment that the default occurred "on or about November 18,
2004." (Doc. 47 at 17.)

contracts are to be interpreted according to standard contract principles, "striving to give effect to the intent of the parties as expressed by the plain language of the instrument." *DeBartolos v. Underwriters at Lloyd's of London*, 925 A.2d 1018, 1022, (Vt. 2007); *see also McAlister v. Vt. Prop. & Cas. Ins. Agency*, 908 A.2d 455, 461 (Vt. 2006); *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 862 A.2d 251, 256 (Vt. 2004). In this case, the Bond provides two conditions precedent for nullification of Acstar's payment obligation: first, the Principal (Fine Line) must "well and truly perform all the work specified in said contract"; and second, the Principal must "promptly make payments to all persons supplying the Principal with labor and materials." (Doc. 34-1.) Furthermore, the Bond incorporates the terms, conditions and specifications of the Subcontract. *Id*.

Although there is no Vermont case law discussing the definition of default under § 3663, nor any case law defining default in the surety bond context, numerous federal courts have weighed in on the latter question. In *Elm Haven Constr. Ltd. P'ship v. Neri Const. LLC,* 376 F.3d 96, 100 (2d Cir. 2004), the Second Circuit confronted the issue of what constituted a declaration of default in the context of a performance and payment bond and chose to adopt the Fifth Circuit approach as articulated in *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106 (5th Cir. 1994). In *L & A Contracting Co.*, the Fifth Circuit provided a two-part definition: "To constitute a legal

default, there must be a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract." *Id. at* 110.

Notwithstanding its briefing to the contrary, Defendant Acstar asserted in oral argument that the default may have occurred well before November 18, 2004.  To reach this conclusion, Acstar urged upon the Court a broad definition of "default", stating that even the most minor deficiency in the Principal's performance would qualify as a legal default for the purposes of the Bond.  Such a definition ignores the fact that the Subcontract explicitly confers specific rights and duties on the parties in the event of a breach, in particular, providing the subcontractor, Fine Line, with an option to cure.

The Court finds the Fifth Circuit definition to be more analytically sound.  The *L & A* approach is calibrated to the degree of the breach, requiring conduct sufficient to justify termination.  As such, this approach preserves the parties' contractual rights and duties; it is more sensitive to the bargain actually struck by the parties and more responsive to the underlying business realities in the suretyship context.[3]

The Subcontract contains clear and unambiguous terms governing the Contractor's ability to terminate based on the

---

[3]  In fact, the *L & A* approach is more protective of the surety's interest inasmuch as the surety is insulated from incurring liability for minor or incidental omissions by the principal.

9

Subcontractor's breach of duties.[4]  In particular, Article 7.2.1
of the Subcontract provides that prior to terminating, the
Contractor must give written notice to the Subcontractor and
provide the Subcontractor with seven days to commence correction
of the breach.  Russell first provided written notice to Fine
Line and Acstar of a breach of contractual duties (failure to pay
Fine Line's supplier, Hyster New England) on September 16, 2004.
The Court need not address whether the breach was material:
Russell did not declare Fine Line to be in default and the
Defendants utilized their opportunity to cure the breach by
clearing Hyster's lien on the property; thus, no default
occurred.

On November 18, 2004, a second lien was placed on the Rising
Bear property, once again due to Fine Line's failure to make
timely payment.  At this time, Russell also learned of a number
of outstanding deficiencies owed by Fine Line to other suppliers
and subcontractors.  These failures constituted a material breach
by Fine Line of its express duties under the Subcontract.

On that same day Russell faxed a second letter to Fine Line
and Acstar declaring Fine Line to be in default and requesting
that the Defendants cure the default.  Fine Line took no action
to remedy these failures within the seven days that followed, nor

---

    [4]  Acstar has also attempted to draw a distinction between
Fine Line's performance obligations and its payment obligations;
however, the Subcontract explicitly treats and governs both sets
of obligations.

did Fine Line respond in any way to Russell's letter.  As of
November 25,  Russell was justified in terminating the contract
under Art. 7.2.1 of the Subcontract.  Thus, employing the *L & A*
analysis, a legal default occurred on November 25, 2004.

    **2.  The Time Limitation Provision**

    The second question confronted is when accrual begins under
the time limitation provision.  If accrual began before the date
of default, November 25,2004, then the time limitation provision
necessarily violates § 3663 and the offensive clause must be held
null and void.

    The time limitation provision includes three alternative
triggers: "the date on which Principal ceases work on said
contract or the date on which final payment under the contract
falls due, or the date on which goods and services were received
by obligee, whichever occurs first."  The provision requires that
any action brought to enforce the bond be commenced within one
year of the earliest of these triggers.

    The parties agree that final payment under the contract
never fell due because Fine Line did not complete the work;
consequently this trigger is not relevant.  The parties, however,
disagree on the other two trigger dates.  Acstar argues
persuasively that the relevant date in both cases is November 10,
2004; that on that date Fine Line ceased work on the Subcontract,
and on or before that date, Russell last received goods and
services from Fine Line.

Nonetheless, the power of Acstar's persuasion avails it
nothing: because both trigger dates occurred prior to the default
date, November 25, 2004, both operative clauses of the time
limitation provision violate § 3663 and are null and void under
the statute.

### a.  Date on Which Principal Ceased Work

The parties admit that Fine Line ceased to be physically
present on the job site on November 10, 2004.  Russell, however,
has argued in its motion for summary judgment that the "cease
work" clause should be interpreted to include work performed by
Fine Line's subcontractors, pointing to a New Jersey case, *Eagle
Fire Protection Corp. v. First Indemnity of America Ins. Co.,* 678
A.2d 699 (N.J. 1996).  In *Eagle Fire*, the New Jersey Supreme
Court held that because general contractors may and often do
choose to subcontract their work to others, retaining only
supervisory responsibility, it would be irrational and
inequitable to interpret a "cease work" clause not to include the
work completed by such subcontractors.  *Id*. at 705-07.

Although the reasoning of *Eagle Fire* is persuasive standing
on its own, it is inapposite to the instant facts.  Russell has
argued that the trigger date occurred on December 17, 2004,
because that was the date on which Builder's Insulation completed
work on the project.  Builder's Insulation had previously worked
on the project as one of Fine Line's subcontractors, but, as made
clear in Russell's deposition, Builder's Insulation had ceased

work on the project prior to November 10, 2004, when Fine Line walked off the job.  Only upon executing a new and independent subcontract directly with Russell, did Builder's Insulation return to the project on December 16 and 17, 2004.  Under these facts, the "cease work" clause cannot be read to include the work completed by Builder's Insulation on December 17, 2004, because at that time it was no longer acting as a subcontractor of Fine Line, but rather as a subcontractor of Russell.

Russell has not argued that any of Fine Line's other subcontractors continued work after Fine Line walked off the job on November 10, 2004.  Under the terms of the Bond, the time limitation provision was consequently triggered on that date at the very latest.

Given this trigger date, the time period for commencing suit stipulated by the Bond expired on November 10, 2005.  Section 3663, however, requires that the obligee have one year from the date of the default to commence suit–in this case, until November 25, 2005.  The "cease work" clause thus cut short the statutorily prescribed period by fifteen days.  As such, enforcement of this clause would violate § 3663, and the clause is null and void.

### b.  Date on Which Goods or Services Were Received

The parties agree that there is a latent ambiguity in the "goods and services" clause in the time limitation provision of the Bond, and they have advanced conflicting interpretations of that clause.  Russell proposes that the clause be understood to

13

refer to the *first* date on which goods and services were received (on or before November 30, 2003), while Acstar submits that the clause refers to the *last* date on which goods and services were received (on or before November 10, 2004).[5]

Plaintiff relies principally on the "plain language of the bond" in its argument that the clause refers to the first receipt of goods or services from Fine Line. In particular, Plaintiff points to the final clause in the provision, "whichever occurs first," arguing that this clause modifies the "goods and services" clause and argues that the parties intended to refer to the earliest possible date. However, the normal rules of English syntax do not support such a reading; it is far more reasonable to read the clause "whichever occurs first" to mean *whichever of the three trigger dates in the provision* occurs first. Plaintiff's arguments do not resolve any latent ambiguity in the "goods and services" clause.

A number of arguments commend the opposite interpretation. In particular, rules of construction well-established in Vermont case law support interpreting the "goods and services" clause of the contract to refer to the last receipt of goods and services by Russell. The Vermont Supreme Court has ruled that in cases of ambiguity, it will prefer "that interpretation of a contract which makes it fair and reasonable," *Trustees of Net Realty*

---

[5] The Court notes that both parties have proffered trigger dates that precede the date of default.

*Holding Trust v. AVCO Financial Servs. of Barre,, Inc.*, 520 A.2d
981, 983 (Vt. 1986) and that the language must be "interpreted
with reference to the purpose sought to be accomplished, " *H. P.
Hood & Sons v. Heins*, 205 A.2d 561, 564 (Vt. 1964).[6]

Acstar has noted that the Subcontract clearly contemplated
at the outset that work specified therein would require more than
one year to complete.  If we were to accept Russell's
interpretation of the clause, coverage under the Bond would have
expired before work on the project had been completed.  Such an
interpretation would run counter to Russell's essential purpose
in requiring a performance bond (namely to insure against the
losses associated with a potential default by Fine Line), and
such a reading could not have been a "fair and reasonable"
reflection of the parties' intent at the time the Bond was
executed.  In order to be consonant with the underlying intent of
the parties, the clause must be read to refer to the last receipt
of goods and services which occurred on or before November 10,
2004.

Under the most "fair and reasonable" interpretation, the
"goods and services" clause was triggered on November 10, 2004,
at the very latest, when Russell *last* received goods and services

---

[6] Furthermore, the Vermont Supreme Court has recently decided two cases
in which ambiguities in the insurance contracts were at issue.  In both cases
the Court reiterated the principle that all such ambiguities should be
resolved "in favor of coverage." *McAlister v. Vt. Prop. & Cas. Ins. Agency*,
908 A.2d 455, 461 (Vt. 2006); *DeBartolos v. Underwriters at Lloyd's of London*,
925 A.2d 1018, 1022, (Vt. 2007).

from Fine Line.  The "goods and services" clause, like the "cease work" clause, required that suit be brought by November 10, 2005, cutting short the statutorily prescribed period fifteen days prematurely.  This clause is likewise violative of § 3663 and is thus unenforceable.

**B.  Waiver**

In addition to its statutory arguments, Plaintiff has raised the issue of waiver.  Plaintiff's waiver arguments are predicated on its interpretation of the "goods and services" clause which the Court has rejected.  Nonetheless, having found that the time limitation provision is unenforceable under § 3663, the Court need not address the issue of whether Acstar waived protection under the provision.

**IV.  <u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 32) is GRANTED, and Acstar's Cross-Motion for Summary Judgment (Doc. 47) is DENIED.

Dated at Burlington, Vermont this 27th day of September, 2007.

/s/ William K. Sessions III
William K. Sessions III
Chief Judge
