```
                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF VERMONT
                                    :
JOHN A. RUSSELL CORPORATION,        :
     Plaintiff,                     :
                                    :
     v.                             :     No. 2:05-cv-321
                                    :
FINE LINE DRYWALL, INC.; and        :
ACSTAR INSURANCE COMPANY,           :
     Defendants.                    :
                                    :
```

## OPINION AND ORDER

On September 27, 2007, the Court issued an Opinion and Order granting summary judgment to the Plaintiff, John A. Russell Corporation ("Russell"). In that opinion, the Court found that the time-limitation clause in the underlying performance and payment bond violated 8 V.S.A. § 3663 and was unenforceable. Consequently, the Court held that the timeliness defense asserted by Defendant Acstar Insurance Company ("Acstar") must fail and that Russell was entitled to seek arbitration for its claims under the bond. Acstar filed a Rule 59 Motion for Reconsideration (Doc. 59) on October 12, 2007. For the reasons discussed below, the Court denies Acstar's motion.

### I. FACTS

Because the previous opinion contained a detailed recitation of the facts, the Court limits itself to a brief recapitulation, adding only those additional facts relevant to the arguments

raised in the instant motion.[1]  Russell, a general contractor, entered into a contract (the "Subcontract") for metal framing and gypsum drywall systems with Fine Line Drywall, Inc. ("Fine Line") in 2003.  Fine Line secured a performance and payment bond (the "Bond") with Acstar as surety and Russell as obligee.

The Bond provides for payment of up to $1,186,034 (the full amount payable to Fine Line under the Subcontract) unless "the Principal [Fine Line] shall well and truly perform all the work specified in said contract, and shall promptly make payments to all persons supplying the Principal with labor and materials in the prosecution of the work provided for in said contract." (Doc. 34-1.)  The Bond also contains a time limitation provision: "[N]o suit or action shall be commenced hereunder after the expiration date of one year following the date on which Principal ceases work on said contract or the date on which final payment under the contract falls due, or the date on which goods and services were received by obligee, whichever occurs first." *Id*.

Fine Line began work on the project in November 2003 and

---

[1]  The Court, in its summary judgment decision, analyzed the issue of breach in terms of Fine Line's failure to make payments to suppliers and subcontractors, in violation of its duties under the Bond and the Subcontract.  Because the Court did not have occasion to discuss the issue of repudiation earlier, the Court has provided detailed findings in this opinion regarding the facts relevant to Fine Line's repudiation.  In so doing, the Court has also taken into consideration the documents and affidavits submitted by both parties in conjunction with the instant motion.

ceased work on November 10, 2004.  Acstar has offered evidence of "Subcontract Change Order" documents submitted by Russell.  Based on these documents, Acstar has alleged that there were deficiencies in Fine Line's performance of its obligations under the Subcontract throughout 2004.  (Frazer Supplemental Aff. ¶ 3, Dec. 21, 2007.)  Acstar further contends these documents demonstrate that Russell was aware of and sought to correct Fine Line's deficient work "as early as March 2004."  (Frazer Supplemental Aff. ¶ 5.)  Acstar has never alleged that the deficiencies in Fine Line's performance on or before November 10, 2004, constituted a material breach of the Subcontract, neither in its previous briefing nor in its present memoranda and affidavits.

Throughout the fall, Fine Line's presence at the job site was sporadic.  Daily work logs indicate that in September and October 2004 Fine Line was absent from the job site on six occasions, the periods of absence ranging from one to five days.  (Pl.'s Mem. in Opp'n 2; Pl.'s Mem. in Opp'n Ex. 1.)  After November 10, 2004, Fine Line never returned to the work site.  Russell made repeated attempts to contact Fine Line to determine whether it planned to complete performance of its obligations under the Subcontract.  (Russell Dep. 26:25-27:6, Apr. 2, 2007.)  Fine Line did not respond to any of these attempts and had no further communication with Russell.  (Russell Dep. 20:22-21:3.)

By early December 2004, Russell "suspected [that Fine Line had] abandoned the project." (Russell Dep. 27:15.)

On December 6, 2005, Russell filed a complaint with the Court seeking an order compelling Acstar and Fine Line to submit to arbitration.

## II. DISCUSSION

"The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id*. The motion may be granted if necessary "to correct clear legal error." *Blanchard v. Eli Lilly & Co.*, No. 2:99-cv-256, 2002 U.S. Dist. LEXIS 16739, at *2 (D. Vt. 2002). The inquiry here is whether Acstar has presented case law or factual evidence that supports a conclusion contrary to the one reached in the Court's prior decision.

As the Court noted in its earlier opinion, the parties provided scant briefing in their original submissions on the question of what constitutes a default under the Bond and 8 V.S.A. § 3663. Consequently, the Court seizes this opportunity

4

to address the arguments raised in Acstar's instant motion in detail.  Acstar has challenged the Court's decision on summary judgment on two grounds.  First, Acstar has argued that the Court erred when it held that only a material breach of the Subcontract constituted a default under the Bond and 8 V.S.A. § 3663.  Second, Acstar has argued that Fine Line repudiated the Subcontract on November 10, 2004, thus triggering the year-long period provided by § 3663 for commencing an action.

The Court finds that federal case law uniformly supports the definition of default in the previous opinion.  The Court further finds that Fine Line neither materially breached nor repudiated its performance obligations under the Subcontract until after November 10, 2004.  As such, the time-limitation provisions in the bond impermissibly truncated the year-long statutory period mandated by Vermont law.  The offending provisions are thus void, and the Court's grant of summary judgment to the Plaintiff stands.

**A.  Appropriate Analysis of What Constitutes a Default Under 8 V.S.A. § 3663**

Acstar has argued that the Court erred when it relied upon the definition of default articulated in *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106 (5th Cir. 1994).  In support of its argument, Acstar attempts to distinguish *L & A* from the present case and to suggest that a broader definition is warranted.

First, Acstar argues that the language in the instant bond is distinguishable from the language in the *L & A* bond. In particular, Acstar notes that the *L & A* bond required the obligee to provide adequate notice of the default to the principal and surety. In contrast, the instant bond imposes no specific notice requirements on the obligee.[2] Acstar further notes that the Bond does not use the word "default"; the sole requirement specified on the face of the Bond is that the "Principal well and truly perform the work specified [in the underlying contract]."

The proffered distinctions are indisputable but they prove too little. First, the Court did not rely on *L & A* for the proposition that Russell was obliged to provide notice of an alleged default to Acstar. Nor did the Court import any obligations from *L & A* or *Elm Haven Constr. Ltd. P'ship v. Neri Const. LLC,* 376 F.3d 96, 100 (2d Cir. 2004), into the instant bond. To the extent that the Court discussed issues of notice, its discussion was prompted by the specific rights and obligations enumerated in Article 7.2.1 of the Subcontract (which the Bond expressly incorporates). The Court relied on *L & A* solely for the proposition that a default on a performance bond

---

[2] Notice requirements are commonly included in performance bonds. *See* 4 Bruner & O'Connor on Construction Law § 12:15 (2004). Performance bonds often include multiple remedial options, including an option for the surety to take over and complete the bonded contract. *Id.* Without adequate notice of default, a surety may be prejudiced in its ability to choose the appropriate remedy. The Bond in this case did not provide the surety with any remedies excepting payment of costs.

6

requires a material breach justifying termination of the contract by the obligee.

Furthermore, the circuit panel in *L & A* does not premise its definition of default on the notice provision in that particular bond.  Nor does it restrict its application to bonds that include such provisions.  To the contrary, the panel argues that its definition best addresses widespread and recurring issues in construction litigation.  *L & A* at 110 n.11.  The *L & A* approach offers a clear benchmark for determining whether a default has occurred by requiring a material breach.  A precise definition is particularly appropriate in the suretyship context because of the tripartite nature of the suretyship relationship: the *L & A* definition increases predictability and allows all parties to better estimate the risks of potential actions.  *See generally* James A. Knox, *Representing the Private Owner, in* Construction Defaults: Rights, Duties, and Liabilities § 9.3 (Robert F. Cushman & Charles A. Meeker eds., 1989).

Acstar urges the Court to read the "well and truly perform" language to mean that any deficiency in Fine Line's performance, no matter how minor, constituted a default under the Bond and 8 V.S.A. § 3663.  Although Acstar has intimated that the Court's reasoning is "fanciful," "absurd," "nonsensical," and "made-up," Acstar provides no case law to support its own expansive

interpretation of the bond language.[3]  The Court's approach, however, is supported both by federal case law and by leading commentaries and treatises.  *See L & A Contracting*, 17 F.3d at 110; *Elm Haven Constr.,* 376 F.3d at 100 (applying *L & A* definition); *Lyndon Prop. Ins. Co. v. E. Ky. Univ.*, 200 Fed. Appx. 409, 414 (6th Cir. 2006) (same); *St. Paul Fire & Marine Ins. Co. v. City of Green River*, 93 F. Supp. 2d 1170, 1171 (D. Wyo. 2000) (same); *Reliance Ins. Co. v. Barile Excavating & Pipeline Co.*, 685 F. Supp. 839, 840 (D. Fla. 1988) (looking to materiality of breach in determining default); 4 Bruner & O'Connor on Construction Law § 12:36 (2004) (adopting *L & A* definition); 5-17 Steven G.M. Stein et al., Construction Law ¶ 17.07 (2007); Knox, *supra*, at 201.  Acstar has failed to assert any countervailing legal authority; to the extent that its position is supported by legal argument alone, it fails to meet its burden on the motion for reconsideration.  Indeed, Acstar fails to meet even a less stringent standard.  The Fifth Circuit considered, discussed and rejected the "plain meaning" argument upon which Acstar now implicitly relies.  *L & A Contracting*, 17

---

[3] Acstar does, however, cite extensively to case law to bolster its argument that courts disfavor "nonsensical interpretations" and "fanciful . . . constructions" of contracts—an argument with which it is difficult to take umbrage.  Although the Court does not believe the issue is squarely presented here, the Court adds its support to the presumably non-controversial position that jurists do best to choose sense over nonsense, reality over fancy, and the obvious over the absurd.

F.3d at 110-11.  The Court finds the circuit panel's reasoning on this point compelling.

Moreover, federal courts have specifically relied on the *L & A* definition in interpreting identically-worded bonds. *See MCI Constructors, Inc. v. City of Greensboro*, 125 Fed. Appx. 471, 473-474 (4th Cir. 2005) (looking to whether principal "materially breached the contract" in determining surety's liability); *Clark Constr. Group Inc. v. Allglass Sys.*, DKC 2002-1590, 2004 U.S. Dist. LEXIS 15459, at *24 (D. Md. 2004) (same).  In *Clark Construction Group* and in *MCI Constructors*, the courts confronted bonds that predicated the surety's liability on the principal's failure to "'well and truly perform' its Subcontract obligations."  *Clark Constr. Group*, 2004 U.S. Dist. LEXIS 15459, at *24; *see also MCI Constructors*, 125 Fed. Appx. at 473.  And in both cases, the courts held that "the surety's bond obligation is . . . triggered by the bonded contractor's *material default* of its performance or payment obligations under the bonded contract."  *Clark Constr. Group*, 2004 U.S. Dist. LEXIS 15459, at *24 (emphasis added) (quoting 4 Bruner & O'Connor § 12:2 (2004)); *see also MCI Constructors*, 125 Fed. Appx. at 474.  By following the *L & A* definition, the courts implicitly recognize the need to provide parties with a clear standard for assessing their obligations under a bonded contract.

In contrast, the adoption of Acstar's interpretation would breed confusion.  Under Acstar's expansive and unprecedented approach, the most inconsequential act or omission, if not in strict compliance with the contract, could trigger the year-long statutory period.  Acstar exemplified this point when it contended in oral argument that a subcontractor's failure to use enough fasteners on a segment of drywall could constitute a default.  Acstar's approach provides no minimum threshold: parties could bicker endlessly about how many missing drywall screws or clips constituted a failure to "well and truly perform."  Commentators have noted that the suretyship relationship is fraught with anxiety, but this rule would plunge parties into a state of near-existential uncertainty.

Moreover, Acstar's approach would allow sureties to circumvent the reach of 8 V.S.A. § 3663.  Although there is no legislative history available regarding the enactment of § 3663, the statutory text supports a clear inference regarding the underlying legislative intent.  By providing an absolute "minimum limitation on actions," the Vermont legislature presumably intended to protect obligors from sharp contracting by sureties.  Yet Acstar now invites the Court to interpret the language it has drafted in a manner that would effectively nullify this statutory protection.  Such an invitation could not be accepted without great irony.  The Court thus finds that it correctly interpreted default under the Bond and the Vermont statute to mean a material

breach by the principal of its contractual duties justifying termination by the obligee.

**B.    Timing of Fine Line's Repudiation**

Alternatively, Acstar has raised the issue of repudiation. Acstar argues that even if the Court's definition of default is correct, Fine Line repudiated the Subcontract when it "walked off the job."  (Def.'s Mot. for Recons. 2.)  Although the Court agrees that Fine Line repudiated its performance obligations under the Subcontract, the key inquiry concerns the timing of this repudiation.

"A party repudiates a contract when that party explicitly or implicitly represents that he cannot or will not perform his obligations under the contract. This can be accomplished by either: '(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach . . ., [or] (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'"  *Record v. Kempe*, 928 A.2d 1199, 1206 (Vt. 2007) (quoting Restatement (Second) of Contracts § 250 (1981)).  "To constitute a repudiation, the defendant's statements must indicate a 'positive and unequivocal refusal to perform' under the contract." *Lowe v. Beaty*, 485 A.2d 1255, 1257 (Vt. 1984) (quoting *Carvage v. Stowell*, 55 A.2d 188, 192 (Vt. 1947)).

Acstar argues the repudiation occurred the moment Fine Line left the job site on November 10, 2004.[4]  Acstar does not claim, however, that Fine Line made any affirmative statement regarding its intentions at that time.  There is no evidence that Fine Line communicated to Russell that it intended to abandon its contractual obligations on November 10, 2004. To the contrary, the record demonstrates only Fine Line's absence and silence.  Moreover, the record makes clear that Fine Line had been absent from the job site during September and October 2004 on numerous occasions for spells lasting between one day and an entire week.  Against this backdrop, the Court finds Fine Line's mere departure from the job site was not a "positive and unequivocal refusal to perform" sufficient to constitute repudiation.

It was only in the weeks following this departure, after Fine Line had refused to return calls or complete performance of the Subcontract, that Russell was able to determine that Fine Line had repudiated the contract.  No less a commentator than Corbin has observed, "It seems reasonable to believe that expressions of intention that are too doubtful in character to be

---

[4]  In conjunction with this argument, Acstar asserts that Russell submitted performance claims based on alleged deficiencies in Fine Line's performance predating repudiation.  However, claims of minor deficiencies do not alter the calculus of material breach.  Moreover, the merits of Russell's claims are not before the Court but are reserved for arbitration.  The Court's decision on this matter does not constitute an endorsement or rejection of the claims on the merits.  The only question here decided is whether an "obligation to arbitrate exists." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996).

operative as an anticipatory breach standing alone, may be sufficient to operate as a repudiation of the contract if they are accompanied by an actual non-performance . . . ." 10-54 Arthur L. Corbin, Corbin on Contracts § 973 (1951).

The facts of the instant case conform precisely to the proposition above. Fine Line's departure on November 10, 2004, may very well have aroused fears and suspicions that it was abandoning the project. However, given the prior course of performance, it was "too doubtful" to constitute a repudiation "standing alone." By early December 2004, however, Russell's fears had been confirmed by Fine Line's continued non-performance. Consequently, the Court holds that Fine Line repudiated its performance obligations under the Subcontract *after* November 10, 2004.

Acstar has also offered an ancillary argument: that Fine Line's breach of its payment obligations should not be relevant because Russell is only pursuing performance claims under the Bond. Because the Court has found that the default was triggered both by Fine Line's material breach and *alternatively* by Fine Line's repudiation, this argument is academic. In either event, the default for purposes of 8 V.S.A. § 3663 occurred *after* November 10, 2004. As such, the time-limitation provision impermissibly truncated the year-long period prescribed by statute, and the timeliness defense fails.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Rule 59 Motion for Reconsideration (Doc. 59) is DENIED.

Dated at Burlington, Vermont this 20th day of February, 2008.

/s/ William K. Sessions III

William K. Sessions III
Chief Judge